UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Charles M. Johnson, Trustee
for the Charles M. Johnson
Revocable Intervivos Trust
and Charles M. Johnson

   v.                                    Civil No. 16-cv-171-LM
                                         Opinion No. 2016 DNH 206
People's United Bank, N.A.

**O R D E R**

Between 2013 and 2014, a trusted household employee with debit card access allegedly stole $185,000 from Charles M. Johnson's checking accounts at People's United Bank (the "Bank"). Johnson, individually and as trustee for the Charles M. Johnson Revocable Intervivos Trust, brought suit against the Bank in New Hampshire Superior Court, asserting that the Bank should have detected suspicious activity related to his accounts and prevented the unauthorized withdrawals.[1] The Bank removed the case to this court and now moves to dismiss (doc. no. 3). Johnson objects. For the reasons that follow, the Bank's motion to dismiss is granted.

---

[1] For simplicity, the court refers to Charles M. Johnson in both his individual and trustee capacities as "Johnson."

**Standard of Review**

Under Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (citation omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**Background**

In 2013, Johnson had two checking accounts at the Bank: (1) an account in his capacity as trustee for the Charles M. Johnson Revocable Intervivos Trust (the "Trustee Account"), and (2) a joint account with his father (the "Joint Account").  On April 1, 2014, Johnson's father died and Johnson became the sole owner of the Joint Account.  A Consumer Deposit Account Agreement (the "Agreement") set forth the terms of these accounts.[2]

---

[2] Although Johnson did not attach a copy of the Agreement to his complaint or incorporate the Agreement by reference, both parties, in subsequent filings, acknowledged that this contract established the parties' relationship.  See doc. no. 3-1 at 5;

In early 2013, Johnson hired a personal assistant named Alex Devine to help him and his father with household chores and medical appointments. Johnson was 70 years old and his father was 93 years old at the time. Devine "was a trusted member of the household and essentially became a family member." Doc. no 1-1 at ¶ 17. As part of the employment arrangement, Johnson provided Devine with his Trustee Account debit card so that Devine could shop for him. Johnson also authorized Devine to use the debit card to make purchases of goods and services for herself, but he never gave her permission to make cash withdrawals.

Throughout 2013 and 2014, Devine and her then-boyfriend, Adam French, made a number of unauthorized withdrawals from the Trustee Account using Johnson's debit card.[3] The first such withdrawal occurred on March 20, 2013, when the couple withdrew

---

doc. no. 5 at 16. The Bank attached portions of the Agreement to its motion to dismiss (doc. no. 3-3), and Johnson attached the entire Agreement to his objection to the Bank's motion. Doc. no. 5-1. Because Johnson's breach of contract claim is dependent on the Agreement, and neither party challenges the document's authenticity, the court can properly consider the Agreement in evaluating the Bank's motion to dismiss. See Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998); see also Clorox Co. P. R. v. Proctor & Gamble Comm. Co., 228 F.3d 24, 32 (1st Cir. 2000).

[3] Johnson's complaint alleges that either Devine or French, or both, made the alleged unauthorized transactions. For simplicity, this order uses the phrase "the couple" rather than "Devine and/or French."

$120 from the Trustee Account without Johnson's permission. Prior to that withdrawal, the Trustee Account had a balance of $32,548.47. The couple continued making unauthorized withdrawals until the Trustee Account balance was reduced to $1,856.74 in September 2013.

Then, on September 26, 2013, without Johnson's permission, the couple electronically accessed the Joint Account and transferred $20,000 from the Joint Account to the Trustee Account. Prior to that transfer, the Joint Account had a balance of $282,701.76. On that same day, the couple withdrew a total of $800 from the Trustee Account. Over the next year, the couple continued this scheme of transferring funds from the Joint Account to the Trustee Account and then withdrawing cash from the Trustee Account with the debit card.

On August 6, 2014, the couple withdrew $500 from the Trustee Account. On August 7, they transferred $9,500 from the Joint Account to the Trustee Account and then withdrew $500 from the Trustee Account. But on August 8, the Bank froze the Trustee Account because of possible fraudulent activity. On that date, the couple attempted to withdraw money from the Trustee Account but was unable to do so because the account was frozen. French, impersonating Johnson, then called the Bank's "Call Center" and complained that he was unable to withdraw

4

money using the debit card.  Johnson alleges that French sounded much younger than Johnson during the phone conversation.  The Bank's call center representative asked French certain questions to verify whether he was actually Johnson.  Despite sounding hesitant, French was able to answer most questions correctly, and the call center representative asked French for a telephone number where she could reach him if they were interrupted.  French put the representative on hold for quite some time and then finally gave her a phone number that did not appear in any of the Bank's records on Johnson.  The representative conferred with the Bank's Fraud Center regarding this discrepancy.  She then asked French to confirm the amount of the August 7 funds transfer.  French correctly answered the question, and the Bank unfroze the Trustee Account.  The couple then continued using the debit card to make unauthorized withdrawals.

In September 2014, the manager of the Bank's Stratham branch and a Bank fraud investigator both called Johnson to inform him that the Bank had frozen his accounts because of what appeared to be fraud.  Johnson told the Bank that he had not authorized anyone to transfer funds from the Joint Account or make cash withdrawals with the debit card.

Johnson alleges that between March 2013 and September 2014 the couple wrongfully withdrew approximately $185,000.  Johnson

had not reviewed any bank account statements during that period because Devine hid them.

Johnson asserts that, because of his age, the Bank should have been more suspicious of the large electronic transfers and withdrawals. Johnson also alleges that he has a low understanding of financial and banking matters, and that the Bank knew he was an easy target for this type of fraud. Johnson filed this lawsuit in New Hampshire Superior Court, Rockingham County, alleging that the Bank failed to protect his accounts when the couple transferred funds from the Joint Account and withdrew money from the Trustee Account. The Bank removed the case to this court on the basis of diversity jurisdiction.

## Discussion

Johnson asserts four claims against the Bank: Negligence (Count I); Misrepresentation (Count II); Breach of Contract (Count III); and Failure to Meet Depository Obligations (Count IV). The Bank moves to dismiss all claims.

A.   Count I: Negligence

Johnson alleges that the Bank is liable for negligence because it allowed the couple to wrongfully withdraw money from the Trustee Account and transfer money from the Joint Account. Johnson alleges that the Bank had a duty to use reasonable care

to ensure that such wrongful withdrawals and transfers did not take place.[4]  The Bank, relying on Ahrendt v. Granite Bank, 144 N.H. 308 (1999), contends that a bank owes no such duty of care to protect its customers from the fraudulent conduct of third parties.  The court agrees.

To establish negligence under New Hampshire law, the plaintiff must demonstrate that the defendant breached a duty that it owed to the plaintiff, and that the breach proximately caused injury to the plaintiff.  England v. Brianas, 166 N.H. 369, 371 (2014).  The existence of a duty in a particular case is a question of law.  Id.  "In New Hampshire, the general rule is that an individual has no duty to protect another from the criminal acts of third parties."  Peterboro Tool Co. v. People's United Bank, 848 F. Supp. 2d 164, 168 (D.N.H. 2012) (citations omitted).  However, such a duty may arise if a special relationship exists.  Id.

---

[4] Johnson also argues that a provision in the Agreement limiting daily cash withdrawals to a certain amount, see doc. no. 5-1 at 13-14, created an affirmative duty that the Bank breached by allowing withdrawals over that limit.  However, the economic loss doctrine precludes negligence claims that are based on a party's performance of the contract.  See Wyle v. Lees, 162 N.H. 406, 410 (2011).  See also infra, pp. 12-13 (discussing economic loss doctrine).  Thus, the Bank's alleged violation of a contractual provision cannot plausibly serve as the basis for Johnson's negligence claim.  Rather, Johnson's negligence claim must be based on an independent duty that the Bank owed Johnson outside the contractual relationship.  See Wyle, 162 N.H. at 410.

In Ahrendt, the 80-year-old plaintiff signed handwritten notes authorizing her bank to pay a home repairman more than $50,000 in four separate transactions. 144 N.H. at 309-10. The bank employee who processed the first transaction felt "uncomfortable," but issued a bank check to the repairman after calling the plaintiff to confirm her intent. Id. at 310. After the fourth transaction, the plaintiff's account was overdrawn and her family discovered that the man had "cheated" the plaintiff. Id. The plaintiff sued the bank, alleging that the bank's agents had reason to believe that the repairman was exploiting the plaintiff and failed to fulfill their duty to protect her. Id. at 314.

The New Hampshire Supreme Court described the relationship between a bank and its customer or depositor as follows:

> As a general rule, the relationship between a bank and a customer is not a fiduciary one unless the law otherwise specifies. The relationship between a bank and its depositor is a debtor-creditor relationship. As such, the relationship between an ordinary depositor and the bank is contractual in nature.

Ahrendt, 144 N.H. at 311 (internal citations omitted). The court rejected the existence of a special relationship between the parties and held that the bank did not owe the plaintiff a duty of care outside the contract. Id. at 314 ("We decline to hold that the relationship between a bank and its customer, under the facts of this case, gives rise to a special duty to

protect the customer from the fraudulent conduct of third parties that the law would not otherwise impose.").

In Peterboro, Judge Barbadoro, relying on Ahrendt, held that a bank owed no duty of care to protect its customers from a third party's misappropriation of funds. See 848 F. Supp. 2d at 168-69. In that case, the fiduciary for a profit-sharing plan and trust stole nearly $250,000 from a money market account at a bank. Id. at 166. In dismissing the plaintiff depositor's negligence claim, the court rejected the existence of a special relationship, noting that "a bank ordinarily has no duty to protect a depositor from the unauthorized acts of its agent" where the agent defrauds the depositor. Id. at 169. The court also rejected the plaintiff's claim that the bank voluntarily assumed a duty to protect its customers from fraudulent conduct by establishing internal fraud-prevention procedures. Id. at 169 and n.4 ("Because certain fraud detection and prevention measures are mandated by the federal regulatory regime concerning banks, it cannot be that a bank that complies with required procedures loses the benefit of Ahrendt and 'voluntarily' assumes a duty that it does not otherwise owe to its depositors."). Thus, the bank-customer contract defines and controls the legal relationship between a bank and its

9

customers, and a bank ordinarily owes no independent duty to protect its customers.

Here, as in Ahrendt and Peterboro, the Bank owed Johnson no special duty of care. Rather, the Agreement controls the parties' legal relationship and sets forth the Bank's obligations to Johnson.

In both Ahrendt and Peterboro, the plaintiff had given the fraudster certain access to the plaintiff's account. Johnson argues that the present case is distinguishable from Ahrendt and Peterboro because he never gave Devine express permission to withdraw cash using the debit card. While perhaps relevant in a lawsuit against Devine, that fact is not relevant here, where the question concerns the Bank's duty to Johnson.

The complaint alleges that Johnson hired Devine to work for his family and entrusted her with his debit card; Johnson's decision to give Devine his debit card provided her with access to the accounts. Like the fraudster in Peterboro, Devine used her account access to defraud Johnson. Ahrendt and Peterboro make clear that a bank does not owe its customers a duty to prevent fraudulent conduct by an agent who exceeds her authority or misappropriates funds. See Ahrendt, 144 N.H. at 314; Peterboro, 848 F. Supp. 2d at 168-69. The parties' ordinary

bank-depositor relationship does not give rise to a special duty in this case.

Additionally, Johnson asserts that both the Bank's adoption of fraud-prevention measures and the Federal Trade Commission's adoption of certain "Red Flag" rules created an independent duty. In Peterboro, however, Judge Barbadoro persuasively rejected a similar argument on an analogous set of facts. See Peterboro, 848 F. Supp. 2d at 169 and n.4.

Finally, Johnson appears to allege that the Bank's decision in August 2014 to freeze the Trustee Account because of potential fraud, and later unfreeze the account after the telephone conversation with French, created a special duty. Under similar circumstances, however, the New Hampshire Supreme Court found no special duty where the fraudster's conduct caused the bank employee to become suspicious. See Ahrendt, 144 N.H. at 314. Likewise, here, the Bank's suspicion does not create any special duty.

In sum, Johnson has failed to allege facts sufficient to establish that the Bank owed Johnson a duty to protect his accounts from the fraudulent conduct of the couple. Johnson has therefore failed to state a plausible claim of negligence, and the Bank is entitled to dismissal of Count I.

B.   Count II: Misrepresentation

Johnson claims that the Bank is liable for misrepresentation because it stated that his deposits "would be safeguarded against wrongful withdrawal." Doc. no. 1-1 at ¶ 75. Although Johnson does not specify whether this claim is based on a theory of negligent or intentional misrepresentation, the court addresses both theories below.

1. Negligent Misrepresentation

The elements of a negligent misrepresentation claim under New Hampshire law are "a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." Wyle, 162 N.H. at 413. The Bank argues that the economic loss doctrine precludes Johnson's misrepresentation claim. The economic loss doctrine "preclude[s] contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." Id. at 410 (internal quotation marks omitted). Where a misrepresentation claim focuses on the plaintiff's performance of the contract, as opposed to creation of the contract, the claim is barred by the economic loss doctrine. Id. at 411. See also Schaefer v. Indymac Mortg. Servs., 731 F.3d 98, 109 (1st Cir. 2013) ("[R]epresentations made during the course of the contract's performance and related to the subject matter of the

12

contract . . . are so bound up in the performance of the contract as to be barred by the economic loss doctrine." (internal quotation marks omitted)). To survive, negligent misrepresentation claims must be based on "independent, affirmative misrepresentations unrelated to the performance of the contract." Wyle, 162 N.H. at 412 (internal quotation marks and citation omitted).

Here, Johnson's allegations concern the Bank's performance of the contract; Johnson does not allege that the Bank made false statements to induce him to enter the contract. According to Johnson, the Bank represented that it would safeguard his accounts. Johnson alleges that the Bank failed to fulfill this promise by allowing the couple to wrongfully withdraw and transfer funds. This assertion is related to the Bank's performance of the contract, i.e, the Bank's obligation to protect Johnson's deposits. Thus, the economic loss doctrine bars this claim.

### 2. Intentional Misrepresentation

The New Hampshire Supreme Court has described intentional misrepresentation as follows:

> The tort of intentional misrepresentation, or fraud, must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation.

13

> In order to withstand a motion to dismiss, the plaintiff must specify the *essential details* of the fraud, and *specifically allege* the facts of the defendant's fraudulent actions.

Tessier v. Rockefeller, 162 N.H. 324, 332 (2011) (emphasis in original) (internal quotation marks omitted). Moreover, Federal Rule of Civil Procedure 9(b) requires that fraud be alleged with particularity. See also Varney v. R.J. Reynolds Tobacco Co., 118 F. Supp. 2d 63, 67 (D. Mass. 2000) ("Even in cases removed from state court, the adequacy of pleadings is measured by the federal rules.") (citing Hanna v. Plumer, 380 U.S. 460 (1965); Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985)).

Johnson's allegations do not meet this standard. Nowhere does the complaint allege that any employee of the Bank made a false statement to Johnson with the requisite mental state. Additionally, the complaint contains no specifics about who made the fraudulent statement and when and where it was made. Johnson's allegations fall well short of stating a viable intentional misrepresentation claim.

In sum, Johnson has failed to state a misrepresentation claim for which relief can be granted under either theory of liability, and the Bank is entitled to dismissal of Count II.

C.   Count III: Breach of Contract

"A breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Lassonde v. Stanton, 157 N.H. 582, 588 (2008) (internal quotation marks and alteration omitted).  Here, much like his misrepresentation claim, Johnson alleges that the Bank "failed to take appropriate safeguards to ensure the safety of the Plaintiffs' deposits thereby breaching its promise [that it would safeguard the accounts]."  Doc. no. 1-1 at ¶¶ 81-82.

The Agreement governs Johnson's relationship with the Bank and sets forth each party's obligations.  Johnson does not allege what term(s) in the Agreement contains the Bank's promise to protect his accounts from the fraud at issue in this case. Moreover, as the Bank notes in its motion to dismiss, the Agreement expressly states that Johnson, not the Bank, would be liable for any transactions made by a person to whom Johnson provided his debit card, even if that person exceeded the scope of her authority.  Doc. no. 5-1 at 12, 14 (the Agreement).

Because Johnson has not pointed to any part of the Agreement in which the Bank promised to safeguard deposits against the fraudulent conduct of third parties, the Bank is entitled to dismissal of the breach of contract claim.

15

D.    Count IV: Failure to Meet Depository Obligations

Lastly, citing Article 4 of the Uniform Commercial Code ("UCC"), see N.H. Rev. Stat. Ann. ("RSA") § 382-A:4-103(a), Johnson alleges that the Bank failed to meet its depository obligations by "fail[ing] to implement reasonable security measures which would have safeguarded the Plaintiffs' deposits . . . ." Doc. no. 1-1 at ¶¶ 87-88.  This allegation, however, does not set forth a viable cause of action.

First, UCC Article 4-103(a), which Johnson cites in support of this claim, does not create a private cause of action.  That subsection states:

> The effect of the provisions of this Article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

RSA § 382-A:4-103(a).  This subsection simply indicates that a bank cannot disclaim certain obligations and liabilities imposed by law, including other provisions of Article 4.  It does not, however, create an affirmative cause of action for failure to exercise ordinary care in handling deposits.

Moreover, Article 4 of the UCC governs a bank's liability with respect to items handled by the bank for purposes of

16

presentment, payment, or collection.  See RSA § 382-A:4-101 cmt. 3.  ("Article 4 defines rights between parties with respect to bank deposits and collections.").  While Article 4 addresses a bank's obligations and liabilities with respect to the collection and payment of checks, it does not cover the electronic transfers and withdrawals at issue in this case.[5]  Count IV does not, therefore, assert a valid cause of action.

## Conclusion

For the foregoing reasons, the Bank's motion to dismiss (doc. no. 3) is granted.  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

November 10, 2016

cc:  John P. McGee, Jr., Esq.
     Michele E. Kenney, Esq.

---

[5] The federal Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., governs electronic account transfers and debit card withdrawals and transactions.  See 15 U.S.C. § 1693a; see also 12 CFR § 1005.3(b).  However, Johnson does not allege, and the facts do not appear to indicate, that the Bank violated any part of that statute.